# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| STATIC CONTROL COMPONENTS, INC., ) | |
| ) | |
| Plaintiff/Counter-Defendant, ) | |
| ) | |
| v. ) | No. 1:08CV684 |
| ) | |
| RICOH ELECTRONICS, INC., ) | |
| ) | |
| Defendant/Counter-Plaintiff. ) | |
| ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on the motion for summary judgment filed by

Defendant/Counter-Plaintiff Ricoh Electronics, Inc. ("Ricoh"). (Docket No. 142.) This

motion has been fully briefed. For the reasons stated herein, this Court recommends that

Defendant's motion for summary judgment be granted to the extent that Plaintiff's Third

Claim for Relief under the North Carolina Unfair and Deceptive Trade Practices Act

(UDTPA), N.C. Gen. Stat. § 75-1.1, be dismissed, and Defendant's counterclaim for unpaid

invoices be granted in part, but that Defendant's motion for judgment otherwise be denied.

The jury trial in this action is set for April 4, 2011. (Docket No. 141.)

## FACTUAL AND PROCEDURAL BACKGROUND

The facts when viewed in a light most favorable to SCC reveal the following. Plaintiff Static Control Components, Inc. ("SCC") is in the business of reselling printer toner, a powder used in laser printers and copiers to form text and images on paper, to remanufacturers of printer cartridges. (Docket No. 28 ("Am. Compl.") at 1.) Defendant Ricoh manufactures and sells toner to, among others, SCC. (*Id*.) This action alleging breach of contract, breach of various warranties, and unfair and deceptive trade practice, arises out of Ricoh's sales of allegedly defective printer toner to SCC in 2008. (*Id*. at 2.) Ricoh asserts a counterclaim for payment by SCC of the contractually agreed-upon value of toner shipped to SCC but not paid for, in an amount greater than $1,400,000. (Docket No. 7 at 12-14.)

The sales of the alleged defective printer toner occurred from April 2008 through August 2008 pursuant to five SCC purchase orders submitted to Ricoh. (Docket No. 147, Ex. 8.) The Ricoh lot numbers for these disputed shipments of toner are 804, 805, 806, and 807. (*Id*.) Ricoh shipped each one of these lots to SCC in 3 to 5 batches. (*Id*.) SCC labeled each of these batches with its own lot number, ranging from 1DJ122 to 1DJ137. (*Id*.)

Well before the sales in 2008, Ricoh sent to SCC a toner sample for SCC to test and "qualify" as an appropriate toner for certain Lexmark printers. (Docket No. 146, Ex. 2 (Dep. of Anthony Causey) at 14-23 (describing qualification process); Ex. 3 (Decl. of Dilip Potnis), ¶ 4 (describing NB-04(1) initial composition); Ex. 5 (Dep. of Dilip Potnis) at 29-32 (SCC

qualified toner before Ricoh sold toner to SCC).  SCC in fact "qualified" that toner formula,

and it became known to both parties as NB-04 toner.[1]  (*See* Docket No. 146, Dep. of Dilip

Potnis at 29-32.)  Ricoh also had a different, internal designation for this toner.  (*Id*.)  SCC

received from Ricoh NB-04 toner from that time up until mid-2008, processed it, and sent

the toner out to SCC customers without any major incidents.  Beginning in July 2008,

however, SCC began receiving complaints from its customers about NB-04 toner clumping

together and producing inferior prints, and SCC notified Ricoh of those complaints.  (Docket

No. 146, Dep. of Dilip Potnis at 115; Docket No. 144, Ex. G.)  Upon further testing by SCC

and Ricoh, differences were noted in the performance of toner from lots 804-807 compared

to the toner SCC received prior to these lots, differences that SCC contends account for the

customer complaints it was receiving.[2]  (Docket No. 146, Dep. of Dilip Potnis at 107-17;

Docket No. 144, Ex. H; Docket No. 147, Ex. 9 (Graham Galliford Report) (SCC expert) at

13 (chart showing print test results for lots 804-807 & previous lot 502); Docket No. 147, Ex.

---

[1]  The date that SCC "qualified" NB-04 toner is not clear from the record.  SCC
contends that it was qualified in 2005.  (Docket No. 146 at 2.)  However, Ricoh's Dilip
Potnis testified in his deposition that SCC qualified LEX54 in the T630 series of Lexmark
printers before Ricoh sold LEX54 to SCC and that Ricoh began shipping LEX54 as NB-04
toner to SCC in June or July of 2004.  (Docket No. 146, Ex. 5 at 29-32.)  The exact date of
qualification is not material for this Recommendation because by either account NB-04 was
qualified prior to the 2008 alleged breaches.

[2]  Ricoh last sold the toner formulation known by Ricoh's internal designation as
LEX54-BD in mid-July 2008 to SCC and since has not sold that formulation to any customer.
(Docket No. 146, Ex. 5 at 129; Ex. 6 at 32.)

14 (7/23/08 email from Dilip Potnis (Ricoh) to Anthony Williams (SCC) giving agglomeration/bulk density test results for NB-04.)

Unbeknownst to SCC, Ricoh changed the formulation for NB-04 toner beginning with the April 2008 shipments to SCC.[3] (Docket No. 146, Dep. of Dilip Potnis at 42-43, 69, 100-02.) Dilip Potnis, Ricoh's director of its California toner operation production division, describes in his declaration the initial ingredients of NB-04–which he designates NB-04(1)–and explains how those ingredients and the toner manufacturing process were changed to create the NB-04(2) formulation. (Docket No. 146, Decl. of Dilip Potnis.) Ricoh referred to this new toner formulation under a new internal designation (LEX54-BD), but used this formulation to fill SCC orders for NB-04 with no mention of the change. (Docket No. 146, Dep. of Dilip Potnis at 69, 101.)

According to SCC's evidence, representatives of the parties orally agreed that the formulation of NB-04(1) would not be changed without Ricoh notifying SCC. William Swartz, SCC president, testified in his deposition that after NB-04 was qualified he told Dilip Potnis and others at Ricoh that the formula of NB-04 should not change without Ricoh advising SCC. (Docket No. 146, Ex. 1 (Dep. of William Swartz) at 75-80.) Anthony Causey, SCC product development engineer, testified in his deposition that when NB-04 was

---

[3] According to Ricoh, several modifications affecting NB-04 toner had occurred over the years without Ricoh notifying SCC. (*See* Docket No. 144, Ex. B (chart showing changes made from May 2004 until July 2008).)

developed he had a conversation with Dilip Potnis and told him that SCC had approved "this formulation" and that SCC would "purchase this formulation," and that "should any changes be made, please make us aware so we can go back through our qualification process and retest and reapprove prior to [Ricoh] sending any new formulation." (*Id*., Ex. 4 (Rule 30(b)(6) dep. of SCC by Anthony Causey), at 155-56.) Mr. Causey stated that Dilip Potnis replied, "Okay, we will let you know. We always let you know." (*Id*. at 156.)

Ricoh lot 804 corresponds to SCC lots 1DJ122 through 1DJ124. (Docket No. 147, Ex. 8.) SCC performed a quality control test on the first batch of lot 804, but did not test the remaining batches of the lot. (Docket No. 146, Anthony Causey Rule 30(b)(6) Dep. at 182-84.) SCC contends that Ricoh representatives had informed SCC representatives that lots were continuous runs, therefore SCC believed that tests of the other batches of a lot would reveal identical test results. (*Id*. at 194.) The performance of the first batch of lot 804 was similar to previous lots of toner acceptable to SCC, but the performance of the second and third batches of lot 804 and of the lots 805, 806, and 807 are now said to be unacceptable to SCC. (*Id*. at 189-213.) Based on the acceptable test result on the first batch of lot 804, SCC released all of lot 804 toner to its customers. (*Id*. at 184.) SCC also ran a quality control test on the first batch of lot 805. (*Id*. at 184-85.) Defects were "noted but were inconsistent," and SCC released all of lot 805 to its customers as well. (*Id*.) SCC did not initially test lots

806 and 807 because, according to SCC, Dilip Pontis of Ricoh advised SCC that testing would yield similar results to what SCC was "already seeing."[4]  (*Id*. at 193.)

On July 10, 2008, SCC informed Ricoh that its customers were complaining about the toner in lots 804 through 806 being clumpy and producing light prints, which SCC had verified upon examination.  (Docket No. 147, Ex. 13.)  SCC advised Ricoh of "unacceptable results" from lots 804-807 on July 18, 2008, during a teleconference with Ricoh representatives.  (*Id*., Ex. 15.)

SCC sold toner from the disputed lots from July 2008 until August 2008.  (Docket No. 143, Ex. J.)  The toner sold came from lots 804, 805, and 807.  (*Id*.)  This toner that SCC sold came from at least three different SCC lots designated as 1DJ124, 1DJ126, and 1DJ127. (*Id*.)  In addition to these sales, the record shows that SCC sold to ILG Graphics toner from lot 1DJ137 (lot 807) which was delivered on September 2 and 4, 2008.  (*Id*., Ex. K.)

SCC purchased lots 804, 805, 806, and 807 from Ricoh by issuing to Ricoh five purchase orders.  (Docket No. 147, Ex. 8.)  Each of these purchase orders lists the product as "Toner-NB-04 630 Polyester."  (*Id*., Exs. 27-31.)  Each purchase order contains several "Terms and Conditions."  (*Id*.)  Term number 5 states that "Buyer may reject and return at

---

[4]  SCC tested lots 806 and 807 later, in approximately August 2008.  (Docket No. 146, A. Causey Dep. at 193.)

Seller's expense any item that contains defective material or workmanship or does not conform to this Order, applicable drawings, specification or samples." (*Id*.)

With regard to damages, SCC's expert, Derek Royster, concludes in his report that the present value of SCC's lost profits due to the actions of Ricoh are at least $1,160,598.28. This figure is said to represent lost profits of SCC for the period from June 1, 2008, until September 30, 2015, the expected life cycle of printers using NB-04 toner. (Docket No. 147, Ex. 36.) Mr. Royster arrived at this figure by projecting the aggregate sales for NB-04 toner after June 2008 based on historic NB-04 sales data and compared that to the actual sales of toner SCC sold as a replacement for NB-04. (*Id*.)

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only when no genuine issue of material fact exists. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. *Id*. at 255. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick Cnty. Comm'rs,* 945 F.2d

716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the

movant carries this burden, then the burden "shifts to the non-moving party to come forward

with facts sufficient to create a triable issue of fact." (*Id*. at 718-19 (citing *Anderson*, 477

U.S. at 247-48).) A mere scintilla of evidence supporting the non-moving party's case is

insufficient to defeat a motion for summary judgment. *See, e.g., Shaw v. Stroud*, 13 F.3d

791, 798 (4th Cir. 1994); *see also Anderson*, 477 U.S. at 248 (non-moving party may not rest

upon mere allegations or denials.)

**B.**     **<u>Breach of Contract (SCC's First Claim for Relief)</u>**

    The elements of a breach of contract claim are: (1) a valid contract existed between

the parties; and (2) defendant breached one or more terms of the contract. *Quorum Health

Res., LLC v. Hugh Chatham Mem'l Hosp., Inc.*, 552 F. Supp. 2d 527, 530 (M.D.N.C. 2007).

Defendant argues that it should be granted summary judgment on Plaintiff's breach of

contract claim because the NB-04 toner sold to SCC was "conforming" under the UCC,

which North Carolina has adopted, and also because SCC "accepted" the shipments of toner

pursuant to the terms of the UCC. (Docket No. 143 at 8-13.) Defendant's arguments

therefore call into question whether Plaintiff can establish a breach of the contracts rather

than whether valid contracts existed. Plaintiff argues that the NB-04 toner shipped in the

disputed lots was not "conforming" under the contracts and that at least some of the

shipments were not "accepted" or were initially "accepted" but then properly rejected under the UCC. (Docket No. 146 at 7-13.)

Plaintiff SCC has established that a reasonable fact-finder could find in its favor on the question whether Defendant breached the contracts at issue – the five purchase orders issued for the disputed lots of toner. Based on the record evidence, a reasonable jury could determine that the toner in lots 804-807 did not perform as well as the NB-04 toner that SCC "qualified." In addition, a reasonable jury could conclude that the parties agreed that the designation of "Toner-NB-04 630 Polyester" in SCC's purchase orders refers to the specific toner formulation "qualified" by SCC without any modification, and that the toner shipped by Ricoh was not that same toner formulation. A reasonable jury could determine that whether the toner of the disputed lots met or exceeded the standard for OEM toner for Lexmark printer engines (as argued by Ricoh at Docket No. 143 at 12) is irrelevant to the question whether the toner conformed to the contract. Therefore, a jury could conclude that when Ricoh unilaterally changed that formula and shipped it to SCC as NB-04 toner in April 2008, it breached the purchase order contracts.

Ricoh argues that SCC accepted the toner in the disputed lots by continuing to resell that toner to customers after SCC complained to Ricoh that the toner was "unacceptable." (Docket No. 143 at 8.) Assuming for the sake of argument that by reselling toner SCC accepted that toner as a matter of law, Ricoh's argument suffers from two defects. First, the

burden is on Ricoh by its motion to point out the specific evidence in the record showing that SCC sold the disputed toner. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 547 n.10 (7th Cir. 2002) (not responsibility of court to ferret through record for support for party's argument). Ricoh generally points to its collection of "pick" tickets (Ex. J) to establish such sales. (Docket No. 143 at 7.) However, Ricoh fails to specifically identify which documents reflect the allegedly relevant sales within that voluminous collection of tickets. (*Id.*) Ricoh also fails to properly link the cryptic references on the tickets to NB-04 toner that is at issue in this action. By way of example, within exhibit J at Bates No. SCC013727 is a document reflecting a sale of "ODY LEX T630 TNR." Written by hand next to that entry is what appears to be an SCC lot number, "1DJ124." The court is apparently supposed to conclude that this shows a sale of NB-04 toner from lot 1DJ124 to an SCC customer on July 31, 2008.[5] However, Ricoh fails to point to evidence in the record supporting such a conclusion from the codes on the ticket.

Moreover, throughout its briefing Ricoh refers to the "disputed lots" of toner as one entity and takes the position that by reselling any part of the disputed lots, SCC as a matter of law accepted all of the disputed lots. (*See, e.g.*, Docket No. 143 at 8-9, 11.) However, Ricoh fails to provide any legal support for its contention that by reselling any part of the

---

[5] Because such sales as to Ricoh lots 804 and 805 are supported by independent evidence in the record, the Court has drawn such conclusions for the purposes of this Recommendation. (Docket No. 146, Ex. 4 at 184-85.)

disputed lots SCC as a matter of law accepted all of the disputed lots. Ricoh also fails to explain how such an approach is consistent with UCC provisions which define rights in terms of "commercial units." *See* N.C. Gen. Stat. §§ 25-2-601(c) (buyer may "accept any commercial unit or units and reject the rest" upon an improper delivery); 25-2-606(2) ("[a]cceptance of a part of any commercial unit is acceptance of that entire unit.").

A "commercial unit" is defined as "a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use." N.C. Gen. Stat. § 25-2-105(6). In addition, examples of a "commercial unit" are a single article or a set of articles or a quantity or "any other unit treated in use or in the relevant market as a single whole." (*Id*.)

SCC's purchase orders show that it ordered a certain quantity of toner in kilograms which would be delivered in 75 kilogram drums. (Docket No. 147, Ex. 28.) A "unit price" is shown on the purchase order which reflects the price per kilogram of toner. (*Id*.) That quantity was delivered in batches which were given unique SCC lot numbers. (Docket No. 144, Ex. E (SCC shipping/receiving chart).) Therefore, each shipment or "batch" given a unique SCC lot number may qualify as a "commercial unit" because the parties treated these amounts as a single whole by shipping and receiving the toner in these quantities.[6] Ricoh has

---

[6] The parties have not briefed whether an even smaller quantity of toner could qualify as a "commercial unit," therefore the Court makes no finding on that issue.

not shown that SCC sold toner from every one of the shipments or batches received from Ricoh.[7]  Accordingly, even if the Court accepts Ricoh's contention that SCC accepted a commercial unit of toner by selling toner from that unit, the Court cannot grant Ricoh summary judgment as to all of the disputed lots as Ricoh requests.

Defendant's motion for judgment as to Plaintiff's claim of breach of contract should be denied.

## C.      Warranties

### 1.      Implied Warranty

SCC raises several claims of breach of warranty.  Ricoh argues that SCC's claim of breach of implied warranty fails because the alleged defects of the toner were obvious upon examination.  (Docket No. 143 at 13-15.)  Ricoh again takes an "all or nothing" approach to this argument.  The Court finds that based on the summary judgment record there is a genuine issue of material fact as to whether Ricoh structured its shipments of its Lot 804 to interfere with or circumvent SCC's discovery that the second and third shipments of that lot did not comply with the purchase order.  If Ricoh did so structure those shipments, Ricoh's

_____

[7] From the Court's review of Ricoh's exhibit J, it appears to show sales of SCC lots 1DJ124, 126, and 127.  In addition, Ricoh's exhibit K shows sales from SCC lot 1DJ137.  Finally, the SCC Rule 30(b)(6) deposition of Anthony Causey shows that SCC made sales from all of Ricoh lots 804 and 805.  (Docket No. 146, Ex. 4 at 184-85.)  However, that leaves unaccounted for the SCC lots which made up Ricoh lots 806 and 807 (except SCC lot 1DJ137), which number approximately 7 lots.

argument that SCC should have discovered the alleged defects must be rejected. Therefore, at least as to Ricoh Lot 804, Ricoh's argument must be rejected. Due to Ricoh's all or nothing argument, Ricoh's entire argument lacks support.

### 2.    <u>Reasonable Notification</u>

Ricoh next argues that all of SCC's warranty claims fail because SCC failed to notify it of any alleged nonconformity within a reasonable time after SCC discovered or should have discovered the nonconformity. (Docket No. 143 at 15-16.) Ricoh contends that SCC discovered or should have discovered the alleged nonconformity of the disputed lots by May 2008 and that SCC's notification in mid-July was too late. (*Id*. at 16.)

The question whether notice was given within a reasonable time "is a question of fact and normally must be determined by the trier of fact." *Maybank v. S. S. Kresge Co.*, 302 N.C. 129, 134 n.1, 273 S.E.2d 681, 684 n.1 (1981) (notice given three years after discovery of defect prima facie reasonable). This is not a case where the sole reasonable inference is that the notice was unreasonably tardy. *See Greenwich Ind. v. Leggett & Platt, Inc*., No. 07-C-6550; 2009 WL 1657441, slip op. at *4 (N.D. Ill. June 11, 2009) (18-month delay was unreasonable as a matter of law). Accordingly, Defendant's argument that as a matter of law SCC failed to provide reasonable notice of the alleged nonconformity should be rejected.

### 3.   Express Warranty

Ricoh next argues that SCC's claim of breach of express warranty fails as a matter of law because any alleged pre-contractual oral representations by Ricoh – that it would not change the toner formulation for NB-04 – are barred by the merger clause in SCC's purchase order.  (Docket No. 143 at 16.)  The rule relied upon by Ricoh bars only evidence of oral statements "which tend to contradict the terms of the written agreement."  (*Id*. at 17 (quoting *Ace, Inc. v. Maynard*, 108 N.C. App. 241, 247, 423 S.E.2d 504, 508 (1992)).  Ricoh fails to explain how such an oral representation as that relied upon by SCC would contradict the terms of the parties' written agreement.  (Docket No. 143 at 16-17.)  As found earlier, a reasonable jury could determine that the purchase order terminology refers to the toner formulation that SCC qualified and with no modification.  If so, a representation that Ricoh would not change the formulation without SCC's knowledge does not tend to contradict the terms of the contract.  Therefore, Ricoh's argument should be rejected.

### 4.   Implied Warranty for Particular Purpose

Ricoh contends that SCC's claim for violation of an implied warranty of fitness for a particular purpose fails because SCC used the disputed lots of NB-04 toner for their ordinary purpose as printer toner.  (Docket No. 143 at 17.)  SCC argues, however, that the particular purpose was not simply that the toner could be used in printers but that it could be

used in certain Lexmark printers to produce a certain quality of print performance. (Docket No. 146 at 18.)

If the jury believes the evidence put forth by SCC regarding its qualification of the NB-04 printer toner, that jury could determine that Ricoh knew from that process that the particular purpose for NB-04 toner was to produce high quality prints from certain Lexmark printers. Ricoh kept the details of the NB-04 formula as a closely-guarded secret. (Docket No. 146, Ex. 3 (Decl. of Dilip Potnis declaring that the formulation of NB-04 toner is known only to two individuals within Ricoh because they must know that formula to manufacture the toner).) Therefore, a jury could conclude that SCC had no choice but to rely upon Ricoh to use its skill to produce acceptable toner. Further, a jury could conclude that Ricoh breached the implied warranty of fitness for a particular purpose if, as SCC's evidence may show, the toner Ricoh provided did not produce high quality prints in the intended Lexmark printers. This showing is sufficient to foreclose summary judgment. *See McDonald Bros., Inc. v. Tinder Wholesale, LLC*, 395 F. Supp. 2d 255, 265 (M.D.N.C. 2005) (setting out elements of claim).

### 5. <u>Implied Warranty Based on Course of Dealing</u>

Ricoh argues that SCC's claim of an implied warranty based on course of dealing fails as a matter of law because evidence of a course of dealing between the parties may only be used to supplement or explain the terms of the contract and not to impose additional

contractual obligations upon a party. (Docket No. 143 at 18.) A reasonable jury could conclude from the record evidence, however, that the toner referred to in the purchase order was the original NB-04 formula qualified by SCC. If so, an implied warranty based on course of dealing would not impose additional obligations upon Ricoh. Therefore, this argument must be rejected.

### 6. SCC's Claim for Lost Profits

Ricoh contends that SCC's claim for lost profits fails as a matter of law. Ricoh argues that an estimate of anticipated profits does not provide an adequate factual basis for a jury to measure damages and that such an estimate is all that SCC has proffered. (Docket No. 143 at 19.) Ricoh relies upon cases whose facts markedly differ from the present action. *See, e.g., Iron Steamer, Ltd. v. Trinity Rest., Inc.*, 110 N.C. App. 843, 849, 431 S.E.2d 767, 771 (1993) (evidence consisted of testimony of defendant that lost profit would "most likely have been around" certain amounts). The specific objections raised by Ricoh on summary judgment review regarding the accuracy of the calculations of SCC's damages expert may be considered by the jury as it determines the weight to give such evidence, if the trial court considers that the damages evidence is not improperly speculative. (*See* Docket No. 143 at 20-22; *Roane-Barker v. Southeastern Hosp. Supply Corp.*, 99 N.C. App. 30, 40, 392 S.E.2d 663, 670 (1990) (lost profits evidence relevant and admissible; jury decides how much weight to give evidence).)

Ricoh also argues that there is no evidence that the alleged lost profits would have been realized absent the alleged breach. (Docket No. 143 at 23.) Ricoh contends that any opportunity for SCC to make profits from NB-04 toner depended entirely on Ricoh's continued production of the toner. It is not disputed, however, that SCC purchased the disputed lots of toner. The record does not support a finding that as a matter of law SCC has not established any lost profits simply because future, additional shipments may not have been available.

Ricoh also argues that there is no evidence that the parties contemplated the recovery of lost profits when contracting. (Docket No. 143 at 24-25.) The evidence supports an inference that Ricoh was familiar with SCC's business and thus knew that lost profits were possible if Ricoh supplied defective toner to SCC which SCC might then resell to its customers. (Docket No. 146, Ex. 1 (Dep. of William Swartz) at 33-35 (describing Ricoh engineers and SCC engineers working together to qualify toner for emerging Lexmark printers which SCC's customers were demanding).) North Carolina law provides that consequential damages are available to an aggrieved buyer for "any loss" resulting from requirements and needs of which the seller at the time of contracting had reason to know. N.C. Gen. Stat. § 25-2-715(2)(a). Comment 6 to section 715(2)(a) provides that for the sale of wares to one who is in the business of reselling them, resale is one of the requirements of which the seller has reason to know. (*Id*. comment 6.) Lost profits have been awarded under

section 715.  *See CBP Res., Inc. v. SGS Control Servs., Inc.*, 394 F. Supp. 2d 733, 742 (M.D.N.C. 2005) (noting that arbitration panel awarded damages under section 715 in the form of lost profits).

Finally, with regard to incidental damages, the trial court or jury will decide whether SCC has carried its burden of establishing those damages with the required certainty.  There is no basis for finding as a matter of law that SCC cannot do so.

In this Recommendation, the Court does not address the specifics of the report or expected testimony of SCC's damages expert.  The Court does not weigh in on the admissibility, in whole or in part, of the expert's opinion.  Questions regarding the admissibility of the expert testimony are best left for trial, when an overall context for the proffered testimony is developed in evidence before the Court.

### 7.     Breach of Duty of Good Faith and Fair Dealing (SCC's Second Claim for Relief)

Ricoh argues that SCC's claim for breach of duty of good faith and fair dealing is "part and parcel" of its breach of contract claim and therefore fails along with it.  (Docket No. 143 at 25).  However, because Ricoh's argument for dismissing SCC's breach of contract claim should be rejected, SCC's claim for breach of duty of good faith and fair dealing should also remain.

**8.      Unfair and Deceptive Trade Practice (SCC's Third Claim for Relief)**

Ricoh contends that SCC's claim for unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1 should be dismissed.  (Docket No. 143 at 26-27.)  In a line of cases the Fourth Circuit has cautioned strongly against allowing tort remedies for what is at bottom a contract dispute.  *See Strum v. Exxon Co.,* 15 F.3d 327, 329 (4th Cir. 1994); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 345-46 (4th Cir. 1998).  North Carolina courts hold that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under Chapter 75.  *See Broussard*, 155 F.3d at 347.  North Carolina law requires a showing of "substantial aggravating circumstances" to support an unfair and deceptive trade practices claim.  *Id*.

SCC argues that substantial aggravating circumstances exist because prior to shipping the toner Ricoh attempted unsuccessfully to obtain SCC's approval for the toner.  (Docket No. 146 at 14.)  SCC also contends that Ricoh shipped the modified toner in the second batch of lot 804 to circumvent SCC's quality control testing and evade detection.  (*Id*. at 15.)  Even assuming such allegations are true, they fail to rise to the level required to transform this contract dispute into one actionable as an unfair and deceptive trade practice with its ensuing tort-like treble damages.  Such alleged actions relate to Ricoh's contract performance and are not distinct from the alleged breach of contract.  Accordingly, summary judgment should be granted to Ricoh on SCC's claim of an unfair and deceptive trade practice.  *See Mecklenburg*

*Cnty. v. Nortel Gov't Solutions, Inc.*, No. 3:07-CV-320; 2008 WL 906319 (W.D.N.C. Apr. 1, 2008) (dismissing UDTPA claim based on actions related to contract performance); *Aerospace Mfg., Inc. v. Clive Merchant Grp., LLC*, No. 1:05CV597; 2006 WL 1476906 (M.D.N.C. May 23, 2006 (alleged misrepresentation of ability to fulfill contract not sufficient to support UDTPA claim).

9.     **Ricoh's Counterclaim**

Ricoh moves for summary judgment on its counterclaim by which it seeks payment for toner shipped to and accepted by SCC. (Docket No. 7.) Ricoh first seeks judgment in the amount of the contract rate for the NB-04 toner that SCC "accepted." (Docket No. 143 at 27.) However, the issue of whether this toner conformed to the contract is still in dispute. Therefore, judgment should not be granted for this amount.

Ricoh also seeks judgment in the amount of the contract rate for shipments of toner other than NB-04 (NB-02 and NB-20) which SCC has refused to pay Ricoh. (*Id*. at 28.) The parties agree that SCC was invoiced by Ricoh for $559,932 of NB-02 and NB-20 toner for which Ricoh has not been paid. (Docket Nos. 153, 154.) SCC attempts to justify its non-payment of these shipments based upon a UCC provision which allows it to deduct its damages "from any part of the price still due under the same contract." N.C. Gen. Stat. § 25-2-717. However, SCC fails to show that these prices due are "under the same contract" as the provision requires. Ricoh presents the purchase orders for these shipments of NB-02 and

NB-20 toner which are clearly different from the purchase orders, and thus the contracts, issued for the NB-04 toner shipments.  (Docket No. 154, Ex. A.)  Accordingly, judgment should be granted in favor of Ricoh for the contract price of the unpaid NB-02 and NB-20 toner shipments to SCC totaling $559,932.

## Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Defendant's motion for summary judgment (Docket No. 142) be denied, except that it be granted in part on Defendant's counterclaim as set out above and that it be granted as to Plaintiff's Third Claim for Relief of unfair and deceptive trade practice.


_____
/s/ P. Trevor Sharp
United States Magistrate Judge


Date:  February 8, 2011